**AFFIRMED and Opinion Filed January 31, 2022**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-21-00712-CV

## IN THE INTEREST OF A.M., A CHILD

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 199-30187-2019**

## MEMORANDUM OPINION
Before Justices Schenck, Reichek, and Carlyle
Opinion by Justice Reichek

Appellant appeals the trial court's order terminating his parental rights to his biological son, A.M. Appellant contends the evidence is insufficient to support termination because genetic testing did not show he was the father of A.M. until five weeks before trial and he was not given a reasonable amount of time to complete services. For reasons set out below, we overrule appellant's issues and affirm the trial court's order.

BACKGROUND

A.M. was born on December 17, 2019, and umbilical cord testing showed he was positive for amphetamines and methamphetamines. The Department of Family and Protective Services, which had a safety plan in place prior to A.M.'s birth,

initially planned to allow A.M. to be released to his maternal grandmother. But, after an investigation, the Department determined she would not be a proper placement.[1] Mother told the Department that she did not know who A.M.'s father was because she had "a one night stand with many different people." Mother was unable to provide the Department with a suitable alternative to the maternal grandmother; consequently, on A.M.'s release from the hospital, he was placed with a foster family, where he has remained ever since.

On December 23, 2019, the Department filed its Original Petition for Protection of the Child, for Conservatorship, and for Termination in Suit Affecting Parent-Child Relationship, alleging a continuing danger to the health or safety of A.M. if returned to the parent. The petition alleged the presumed/alleged father was unknown. On the same day, the trial court appointed attorneys ad litem to represent the interests of Mother, unknown father, and A.M.

Early on, Mother identified two men who could be A.M.'s father. After one of the two men was ruled out, Mother told the caseworker there was a third man who could be the father, but he did not want to be involved "due to warrants." By no later than August 2020, Mother had identified that man as appellant. That same month, the Department completed a "diligent search" for appellant, and caseworker

---

[1] The Department found that the maternal grandmother had a history with the agency that included a "reason to believe" finding for neglectful supervision after another child died in her care.

Shawanda Fulton sent a certified letter to him at a Farmersville address that had been connected with him for his entire adult life. Ten days later, Mother told Fulton that appellant received the letter and had called her, cursed her out, and hung up the phone. Mother asked Fulton if appellant would be arrested if he went to take a DNA test; Fulton said she did not know "but doubted it."

The following month, the Department filed its second amended petition, naming appellant as one of the alleged fathers and requesting service of process on him. Following a permanency hearing on September 22, the trial court ordered appellant to submit to DNA testing no later than October 29, 2020, and ordered him to participate in a list of services. Additionally, the court extended the case dismissal date to June 26, 2021,[2] because Mother had identified appellant and the Department needed additional time to locate and serve him and conduct paternity testing.

Over the next several months, the Department made several attempts to locate appellant and serve him with process. Caseworkers sent letters, made phone calls, sent text messages, and reached out on appellant's social media account but did not hear from him.

The case was set for trial on March 22, 2021, but Mother mediated the case and agreed to relinquish her rights to A.M. On April 20, 2021, the trial court

---

[2] The permanency order actually states the 180-day extension date as June 26, 2020, but the year is clearly a typographical error, given the original dismissal date of December 28, 2020.

approved and accepted Mother's voluntary relinquishment and indicated on the docket sheet that it would "proceed to trial on Unknown Father." Two days later, the trial court signed an order for substituted service on appellant, and citation issued on April 30. In that same time period, the trial court reset the case for a trial before the court on May 26, 2021.

On April 28, Tonya Rodriguez, the Department's conservatorship supervisor, received a call from a female relative of appellant's asking about A.M. The woman indicated she wanted A.M. to be placed with her, and Rodriguez explained that the Department first needed to establish paternity for the child and suggested appellant contact his attorney. Later that same day, Rodriguez received a second call from another relative who wanted more information and clarification. Through the family's efforts, appellant was served at the Farmersville address on May 3, 2021.

On May 14, appellant submitted a DNA sample for paternity testing. Trial began on May 26 and reconvened on July 20, 2021. In the meantime, the DNA results showing that appellant is the biological father of A.M. were filed with the court on June 14. At trial, six witnesses testified: appellant, three CPS workers, the CASA supervisor, and A.M.'s foster father.

Appellant was the first witness. He testified he was forty-six years old and had known Mother for nine years. The two had a sexual relationship, and Mother told him when she became pregnant that he may be the father. When given that

4

information, he said he decided he would "just wait . . . until she gave birth and then go from there."  The two communicated "[o]ff and on" during the pregnancy.

On the day A.M. was born, Mother sent appellant a picture by text message. Appellant did not respond and said he did "[n]othing" to determine if he was A.M.'s father.  Appellant said that, a month later, Mother notified him by text message that the Department had removed A.M. from her care.  He said he did not know Mother was using drugs when she was pregnant, but he heard "later on" from a friend that A.M. was removed because he had tested positive for drugs.  He did not tell any of his family members that A.M. could be his son or show them the infant's photograph after he was born.

Appellant testified he did not recall receiving a letter from caseworker Fulton in August 2020 asking whether he wanted to "work services" and undergo a paternity test, but he admitted that he "may have" called Mother on August 24 and yelled at her for giving his name to the Department.  He said his mother, who lived at the Farmersville address, told him about the letters she was receiving from his lawyer and the Department about this case, and he knew the Department was trying to locate him to determine if he was A.M.'s father.  In addition, he said Mother told him about the court hearings, but he did not understand they were being conducted virtually (by Zoom) instead of in person.  Appellant testified he did not want to submit to paternity testing because he was waiting for the other men to be tested, and he did

5

not attend any prior court hearings because he did not want to be arrested on an outstanding warrant. He did not investigate getting his own paternity test or contact Fulton or anyone at the Department to see if he would be arrested if he went to take a paternity test. And, he acknowledged, when he eventually did go for paternity testing, he was not arrested.

Appellant admitted that he did not contact the Department about this case until the week before the July trial date and that his aunt and sister contacted the Department to arrange paternity testing after they received notice of the trial setting. He never submitted the name of any relative as a potential placement for A.M. because he "didn't know for sure" that he was the father.

On questioning by his lawyer, appellant testified that now that he had been confirmed as the father of A.M., he was willing to be drug tested and begin services. He also acknowledged that he probably could not raise the child by himself and wanted his sister to care for A.M. When asked why it took him "so long to get started," appellant said he "just waited" because he "heard there were two other guys before me and they got tested, and so I was the third one." He also acknowledged that he was advised by counsel "to start doing some things" whether he had been tested or not, but he did not want to put himself at risk of being incarcerated. But, he also clarified that he was not "afraid" he was going to be arrested if he came to court, but that he "just need[ed] more time" to put things in order so that he could

6

take care of his "legal issue." He later clarified that his "legal issue" was a pending charge for possession of methamphetamine and that he was "sure" he would "go to prison" for it.

And, finally, appellant testified he was the father of three other children. One of those children lived with his sister, and the other two lived with their mother. Although he said he sees them, he also said he does not financially support them.

The trial court also heard testimony that the Department had made several efforts to locate and contact appellant during the course of the case and have him served, and documentary proof of those efforts was admitted into evidence. The caseworkers and supervisor also testified that A.M.'s family contacted them after receiving notice of the trial setting and that appellant did not contact the Department until a week before he first appeared in court for trial. Both caseworkers who had been assigned to the case recommended appellant's rights be terminated. As one of the caseworkers explained, the case had been "ongoing for a while" and an extension was granted that afforded appellant "plenty of opportunity to come forward earlier in this case to try to establish a relationship" with A.M.

Additionally, there was evidence that A.M. was thriving with his foster family, who had cared for him since he was three days old and wanted to adopt him. The CASA volunteer testified that she believed it would be "extremely traumatic" to remove him and place him with appellant or appellant's relatives, who had only

shown interest "very recently." She said that even if appellant were to begin services immediately, A.M. would be two or two and a half years old by the time they were completed.

After hearing the evidence, the trial court terminated appellant's parental rights, finding that he had violated subsections (A), (B), (C), (F), (H) and (N) of 161.001(b)(1) as well as section 161.002(b)(3) and that termination was in A.M.'s best interest. This appeal ensued.

ANALYSIS

The focus of both parties' briefing is on subsection (N), constructive abandonment and, because we conclude it is dispositive, we address that ground. In doing so, we will assume without deciding that appellant adequately addressed the sufficiency of the evidence to support grounds (A), (B), (C), (F), and (H), and did not waive his complaint, even though he did nothing more than provide a general citation to a case that involved none of those grounds.

The decision to terminate a parent's rights to his child must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a). Evidence is "clear and convincing" if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. Due process demands this heightened standard because termination

8

results in permanent, irrevocable changes for the parent of the child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In a legal sufficiency review, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id*. at 266. We resolve any disputed facts in favor of the finding if a reasonable factfinder could do so and disregard all evidence that a reasonable factfinder could have disbelieved. *Id*. We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id*.

In reviewing factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether a factfinder could reasonably form a firm conviction or belief about the truth of the State's allegations. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id*.

9

A parent constructively abandons a child when (1) the child has been in the permanent or temporary managing conservatorship of the Department for not less than six months, (2) the Department has made reasonable efforts to return the child to the parent, (3) the parent has not regularly visited or maintained significant contact with the child, and (4) the parent has demonstrated an inability to provide the child with a safe environment. TEX. FAM. CODE ANN. § 161.001(b)(1)(N).

Here, appellant argues he was not shown to be A.M.'s father until the paternity testing results on June 14, 2021, and the trial court failed to give him sufficient time to complete services, particularly in a pandemic. He therefore contends that the Department failed to produce evidence that it made reasonable efforts to return the child to him as required by subsection (N). We are unpersuaded by appellant's argument.

As appellant recognizes, his parental rights were not terminated for failure to comply with a court order or complete services under subsection (O). *See id.* § 161.00(b)(1)(O). And while implementation of a service plan is often the means by which the Department establishes its reasonable efforts to return a child to a parent, it is not the exclusive means of establishing that element. *In re J.W.*, 615 S.W.3d 453, 463 (Tex. App.—Texarkana 2020, no pet.); *In re J.G.S.*, 550 S.W.3d 698, 704–05 (Tex. App.—El Paso 2018, no pet.). Rather, the Department can prove it made reasonable efforts to return the child to appellant by showing that appellant

10

impeded the Department's attempts to timely adjudicate appellant's parentage. *In re J.W.*, 615 S.W.3d at 465. In other words, an alleged father in appellant's situation cannot use a delay in adjudication of parentage that he created to defend against termination of his parental rights. *Id.*

Here, the evidence showed that appellant was aware from the very beginning that he could be A.M.'s father. Mother told him she was pregnant and that he could be the father, texted him a picture of A.M. on the day he was born, and told him that A.M. had been removed from her care a month later. And while she did not initially name appellant as a potential father, she identified him to the Department by no later than August 2020. That same month, the caseworker sent him a letter at a Farmersville address seeking his involvement. The address was the residence of appellant's mother and was one that had followed him his entire adult life. Appellant did not respond to the Department; instead, he called Mother and cursed her out for giving his name to the Department.

Over the course of the next several months, caseworkers made a diligent search to locate appellant and made several attempts to contact and/or serve him. They sent letters to different addresses used by him in the past, attempted to call him on phone numbers connected to him, and attempted to contact him on social media. Documentary proof was admitted to show those efforts. And appellant knew of the Department's attempts to contact him and the reason. He also knew of the various

11

court hearings. Nevertheless, he refused to respond because, based on his own testimony, he feared being arrested on an outstanding warrant, he wanted to wait to see the paternity results of the other two men identified by Mother, and/or he needed "more time" to get matters in order to take care of his legal issues. When he finally confirmed he was A.M.'s father in June 2021, he waited to contact the Department for more than a month, which was one week before trial. This evidence does not merely establish that appellant impeded the Department's efforts to determine his parentage; rather, it shows he actively avoided the Department and the paternity determination.

To the extent appellant argues that our sister court's opinion in *J.W.* supports his argument that the Department did not make reasonable efforts to reunite him and A.M., we cannot agree. There, the court found the evidence factually insufficient to show that the father impeded the Department's attempts to timely adjudicate his parentage because the evidence did not explain the reason for the delay in obtaining the father's DNA sample, in obtaining the results, in adjudicating parentage, in issuing the order, and in meeting with the father to discuss the service plan. *J.W.*, 615 S.W.3d at 473–74. Here, as explained above, Father knew the Department was trying to contact him to determine parentage of A.M., but he avoided contact while waiting to see if the other men would be eliminated.

Finally, we reject appellant's efforts to justify his actions in avoiding involvement in this suit because of the COVID-19 pandemic. In his brief, he asserts that he "voiced concerns about his warrants and other legal issues as he did not want to get infected in a jail or anywhere." He asserts that it is "common knowledge" that the jails had high infection rates and, until April 2021, no vaccine was widely available. But he cites no place in the record where he presented this excuse to the trial court. As the trial judge noted, appellant had more time than most parents in these cases because of the extension and he "still failed to do what he needed to do."

We conclude the evidence is legally and factually sufficient to prove that the Department made reasonable efforts to return A.M. to appellant, but appellant impeded its attempts to timely adjudicate appellant's parentage. *See In re D.A.*, No. 2-09-460-CV, 2010 WL 3618718, at *3–4 (Tex. App.—Fort Worth Sep. 16, 2010, no pet.) (mem. op.) (where Department made diligent search to locate father, but father disconnected his phone and caseworkers did not know how to reach him and attempted service at two addresses, evidence was sufficient to show Department's reasonable efforts to return child to him); *In re B.S.T.*, 977 S.W.2d 481, 486 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (evidence sufficient to support termination under subsection (N) where father was located after release from prison and advised of visitation; visited children twice but then made no effort to be involved; was advised to sign affidavit of paternity but did not do so; and caseworker

13

testified reasonable efforts were made to return children to parents), *overruled in part on other grounds by In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).[3]  Appellant has not challenged the remaining elements of subsection (N) or the best interest finding; thus, we do not address those here.  We overrule appellant's issues.

We affirm the trial court's order terminating appellant's parental rights to A.M.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE


Schenck, J., dissenting
210712F.P05

---

[3] The dissent characterizes the majority opinion as terminating appellant's parental rights because he was "slow to establish paternity."  To be clear, Father was not "slow" in this case; he deliberately remained ignorant of the fact of his parentage for the entirety of A.M.'s life and wasted crucial months actively avoiding the Department's attempts to establish paternity and unify him with his biological child.  During this time, A.M. has been well-cared for by foster parents, who want to adopt him and are the only parents this now two-year-old child has ever known.  To suggest this is legally insufficient evidence for which to hold appellant accountable for constructive abandonment is a misperception of the statute and appellant's constitutional parental rights.



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.M., A CHILD

No. 05-21-00712-CV      V.

On Appeal from the 199th Judicial District Court, Collin County, Texas Trial Court Cause No. 199-30187-2019.
Opinion delivered by Justice Reichek; Justices Schenck and Carlyle participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's Final Order in Suit Affecting Parent-Child Relationship for Minor Child – Termination of Parental Rights, Appointment of Managing Conservator – TDFPS.

Judgment entered January 31, 2022.